UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JEANNE M. FERREIRA,           :
          Plaintiff,          :
                              :
          v.                  :     CA 10-425 S
                              :
MICHAEL J. ASTRUE,            :
COMMISSIONER OF THE           :
SOCIAL SECURITY ADMINISTRATION,  :
          Defendant.          :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

This matter is before the Court on the request of Plaintiff
Jeanne M. Ferreira ("Plaintiff") for judicial review of the
decision of the Commissioner of Social Security ("the
Commissioner"), denying disability insurance benefits ("DIB") under
§ 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g)
("the Act"). Plaintiff has filed a motion to reverse the decision
of the Commissioner. See Plaintiff's Motion to Modify, Reverse,
and/or Remand the Decision of the Commissioner Which Determined the
Plaintiff to Not Be Totally Disabled and to Not Be Entitled to
Title II Disability Benefits (Docket ("Dkt.") #19) ("Motion to
Remand"). Defendant Michael J. Astrue ("Defendant") has filed a
motion for an order affirming the Commissioner's decision. See
Defendant's Motion for an Order Affirming the Decision of the
Commissioner (Dkt. #22) ("Motion to Affirm").

This matter has been referred to me for preliminary review,

findings, and recommended disposition pursuant to 28 U.S.C. §
636(b)(1)(B). For the reasons set forth herein, I find that the
Commissioner's determination that Plaintiff is not disabled is not
supported by substantial evidence in the record. Accordingly,
based on the following analysis, I recommend that Plaintiff's
Motion to Remand be granted and that Defendant's Motion to Affirm
be denied.

### Facts and Travel

Plaintiff was born in 1966 and was forty years old as of the
date of the hearing before the administrative law judge ("ALJ").
(Record ("R.") at 17, 84, 512) She has a college degree as well as
a Master's degree in business administration and has past relevant
work as an accountant, a senior accountant, a financial assistant,
and a financial supervisor. (R. at 17)

Plaintiff filed an application for DIB on January 10, 2005,
(R. at 17, 84-86), alleging disability since July 3, 2003, due to
fibromyalgia, chronic fatigue syndrome ("CFS"), migraine headaches,
asthma, shortness of breath, back pain, and depression, (R. at 17,
84). The application was denied initially, (R. at 58, 67-69), and
on reconsideration, (R. at 57, 64-66), and Plaintiff then requested
a hearing before an ALJ, (R. at 59-60). A hearing was held on
March 1, 2007, at which Plaintiff, represented by counsel, appeared
and testified, as did Plaintiff's husband ("Mr. Ferreira") and an
impartial vocational expert ("VE"). (R. at 16, 506-45)

On May 25, 2007, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. at 16-24) Plaintiff requested review by the Appeals Council, (R. at 12), which denied her request on May 19, 2009, (R. at 7). Plaintiff subsequently sought to have her case reopened, (R. at 30, 42), but the Appeals Council, in a letter dated September 8, 2010, declined to do so, (R. at 30), thereby rendering the ALJ's decision the final decision of the Commissioner, (id.). Thereafter, Plaintiff filed this action for judicial review.

## Issue

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

## Standard of Review

Pursuant to the statute governing review, the Court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's role in reviewing the Commissioner's decision is limited. Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999). Although questions of law are reviewed de novo, the Commissioner's findings of fact, if

supported by substantial evidence in the record,[1] are conclusive.
Id. (citing 42 U.S.C. § 405(g)). The determination of
substantiality is based upon an evaluation of the record as a
whole. Id. (citing Irlanda Ortiz v. Sec'y of Health & Human
Servs., 955 F.2d 765, 769 (1st Cir. 1991)("We must uphold the
[Commissioner's] findings ... if a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as adequate to
support his conclusion.")(second alteration in original)). The
Court does not reinterpret the evidence or otherwise substitute its
own judgment for that of the Commissioner. Id. at 30-31 (citing
Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir.
1989)). "Indeed, the resolution of conflicts in the evidence is
for the Commissioner, not the courts." Id. at 31 (citing Rodriquez
v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)
(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420
(1971))).

**Law**

To qualify for DIB, a claimant must meet certain insured

---

[1] The Supreme Court has defined substantial evidence as "more than
a mere scintilla. It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson v.
Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)(quoting Consolidated
Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); see also
Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999)(quoting Richardson v.
Perales, 402 U.S. at 401).

status requirements,[2] be younger than 65 years of age, file an application for benefits, and be under a disability as defined by the Act.  <u>See</u> 42 U.S.C. § 423(a).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. 423(d)(1)(A).  A claimant's impairment must be of such severity that she is unable to perform her previous work or any other kind of substantial gainful employment which exists in the national economy.  <u>See</u> 42 U.S.C. § 423(d)(2)(A).  "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[3] 20 C.F.R. § 404.1521(a) (2011).  A claimant's complaints alone cannot provide a basis for entitlement

---

[2] The ALJ found that Plaintiff met the insured status requirements of the Act as of her alleged onset date, July 3, 2003, and continued to meet them through the date of his decision, May 25, 2007.  (R. at 17, 23)

[3] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b) (2011).  Examples of these include:

> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2)  Capacities for seeing, hearing, and speaking;
> (3)  Understanding, carrying out, and remembering simple instructions;
> (4)  Use of judgment;
> (5)  Responding appropriately to supervision, co-workers and usual work situations; and
> (6)  Dealing with changes in a routine work setting.

<u>Id.</u>

when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a) (2011).

The Social Security regulations prescribe a five step inquiry for use in determining whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a) (2011); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one of the Commissioner's listed impairments; (4) whether she is able to perform her past relevant work; and (5) whether she remains capable of performing any work within the economy.  See 20 C.F.R. § 404.1520(b)-(g).  The evaluation may be terminated at any step.  See Seavey v. Barnhart, 276 F.3d at 4. "The applicant has the burden of production and proof at the first four steps of the process.  If the applicant has met ... her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

### ALJ's Decision

Following the familiar sequential analysis, the ALJ in the

instant case made the following findings: that Plaintiff had not engaged in substantial gainful activity since July 3, 2003, her alleged onset date, (R. at 23); that Plaintiff's fibromyalgia, CFS, cervical degenerative disc disease/stenosis, headaches, and depression constituted severe impairments, (id.); that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (id.); that Plaintiff retained the residual functional capacity ("RFC") to perform a significant range of sedentary, unskilled work with avoidance of prolonged significant standing/walking as well as avoidance of work hazards such as unprotected heights/dangerous machinery and with a moderate limitation in the ability to maintain attention/concentration, (R. at 22, 23); that Plaintiff's multiple pain/fatigue complaints with emotional problems could reasonably be expected to produce some discomfort and symptoms of the type alleged and resulting impairment, but the severity of the pain/symptoms and degree of incapacity alleged was inconsistent, exaggerated, and not credible, (R. at 19, 23); that Plaintiff was not capable of performing her past relevant work as an accountant, senior accountant, financial assistant, or financial supervisor, (R. at 23); that there were significant numbers of jobs in the national economy which Plaintiff could perform, including assembler, table worker, and inspector, (R. at 24); and that Plaintiff was not under a disability, as

defined in the Act, at any time through the date of the ALJ's decision, (id.).

<b>Errors Claimed</b>

Plaintiff alleges a number of errors. <u>See</u> Plaintiff's Mem. at 11-13. The Court focuses primarily on the ALJ's RFC assessment.

<b>Discussion</b>

**I.   The ALJ's RFC assessment**

As noted above, the ALJ found that Plaintiff retained the RFC to perform a significant range of sedentary, unskilled work with certain limitations, specifically a need to avoid prolonged significant standing/walking and work hazards such as unprotected heights/dangerous machinery and a moderate limitation in her ability to maintain attention/concentration. (R. at 22) The ALJ further determined that "the intensity of pain/symptoms and the degree of incapacity asserted by the claimant are found to be inconsistent with the medical evidence of record ...," (R. at 19), in particular with the reports of the State agency consultants, (R. at 20, 21). The ALJ gave several reasons for these findings.

First, the ALJ noted that "the claimant's physical examinations basically noted only multiple 'tender points,' and diagnostic studies including MRI's and E.G.'s were largely 'normal' aside from some 'small' cervical disc bulges/protrusion with 'mild' cervical stenosis as well as bilateral carpal tunnel syndrome." (R. at 20)(internal citation omitted). However, with regard to

8

fibromyalgia,[4] the Court of Appeals for the First Circuit rejected a similar conclusion that "the doctor's examinations of the claimant were, with the exception of the presence of tender points, relatively benign." Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009). The court noted that "musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities," id. at 410, and that "trigger points *are* the only 'objective' signs of fibromyalgia ...," id. at 412. Thus, the First Circuit concluded that "the ALJ 'effectively [was] requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines,' and this, we think, was error." Id. (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106-07 (2nd Cir. 2003))(alteration in original).

Similarly, "'there is no "dipstick" laboratory test for chronic fatigue syndrome;'[5] the medical community instead uses an 'operational' diagnostic procedure, so the disease is 'not per se

---

[4] "Fibromyalgia is defined as '[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause.'" Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2009)(quoting Stedman's Medical Dictionary 671 (27th ed. 2000))(alteration in original).

[5] Chronic Fatigue Syndrome ("CFS") "is a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity. It is characterized in part by prolonged fatigue that lasts 6 months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities." Social Security Ruling ("SSR") 99-2p, 1999 WL 271569, at *1 (S.S.A.); see also Rose v. Shalala, 34 F.3d 13, 16 (1st Cir. 1994) (defining CFS as "a systemic disorder consisting of a complex of variable signs and symptoms which may vary in duration and severity").

excluded from coverage because it cannot be conclusively diagnosed in a laboratory setting[.]'" Rose v. Shalala, 34 F.3d 13, 17 (1st Cir. 1994)(quoting Sisco v. Dep't of HHS, 10 F.3d 739, 744 (10th Cir. 1993)); cf. id. at 18 ("The absence of definitive diagnostic tests makes it plain that the failure of some doctors to state conclusive diagnoses does not constitute substantial evidence to support a finding that claimant did not suffer from the syndrome.")(internal citations omitted). "Physical examination may be within normal limits." Id. at 16. Social Security Ruling ("SSR") 99-2p, 1999 WL 271569 (S.S.A.), emphasizes the importance of a longitudinal clinical record, see id. at *5, *6, in evaluating CFS cases.

While the ALJ in the instant case found Plaintiff's fibromyalgia and CFS to be severe impairments, (R. at 17, 23), he appears to have minimized their effects due to a lack of objective findings. This he cannot do. See Johnson, 597 F.3d at 412 (citing Green-Younger, 335 F.3d at 106-07)(holding that the ALJ erred in rejecting the RFC opinion of the claimant's treating physician on the ground that, except for the presence of trigger points, there was no "objective" evidence to support such opinion)). Given his findings that Plaintiff's CFS and fibromyalgia were severe, the ALJ

> had no choice but to conclude that the claimant suffers
> from the symptoms usually associated with CFS, unless
> there was substantial evidence in the record to support
> a finding that claimant did not endure a particular
> symptom or symptoms. Chief among these symptoms, of
> course, is "persistent unexplained fatigue." The record

>     does not contain any meaningful evidence to support a
>     finding that claimant did not suffer from a significant
>     level of fatigue on a regular basis.

Rose, 34 F.3d at 18 (internal citation omitted); see also id. at 16

("CFS is characterized by the presence of persistent unexplained

fatigue and by the chronicity of other symptoms. The most

prevalent symptoms include episodes of low-grade fever, myalgias,

headache, painful lymph nodes, and problems with memory and

concentration. These symptoms fluctuate in frequency and severity

and may be seen to continue over a period of many months.");

Johnson, 597 F.3d at 414 (noting that "once the ALJ accepted the

diagnosis of fibromyalgia, she also 'had no choice but to conclude

that the claimant suffer[ed] from the symptoms usually associated

with [such condition], unless there was substantial evidence in the

record to support a finding that claimant did not endure a

particular symptom or symptoms")(quoting Rose)(alterations in

original); id. ("The primary symptom of fibromyalgia, of course, is

chronic widespread pain, and the Commissioner points to no

instances in which any of claimant's physicians ever discredited

her complaints of such pain."). Here, the records of Plaintiff's

treating physicians consistently document her symptoms of CFS and

fibromyalgia. See Rose, 34 F.3d at 18 (noting that "from mid-1989

forward, the medical references in the record to symptoms of CFS

are strikingly consistent."); see also (R. at 368, 369, 379, 381,

428).

Second, the ALJ stated that "[t]he fact that the State agency consultants have reported that the claimant is capable of a range of light duty work is not consistent with the severe pain/symptoms and degree of incapacity she alleged at the hearing." (R. at 20) He further noted that:

> The State agency consultants, both at the initial and reconsideration determination levels, determined that the claimant was capable of lifting/carrying up to 20 pounds occasionally with sitting/standing/walking up to 6 hours each during an 8 hour workday with "occasional ..." postural limitations and a "reaching limitation[6] with the need to avoid "moderate" exposure to pulmonary irritants and avoidance of "concentrated" exposure to "extreme" heat/cold/humidity.

(R. at 20)(first alteration in original); see also (R. at 271-79, 377). It is apparent that the ALJ relied in large part on the consultants' assessments in formulating Plaintiff's RFC.

While it is true that the opinions of non-examining physicians are entitled to some weight under the regulations, (R. at 20 n.5) (citing Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427 (1st Cir. 1991); Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327 (1st Cir. 1990); 20 C.F.R. § 404.1527(f); SSR 96-6p, 1996 WL 374180 (S.S.A.)), the First Circuit has stated that:

> [T]he amount of weight that can properly be given the conclusions of non-testifying, non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert. In some cases, written reports submitted by non-testifying, non-examining physicians cannot alone constitute

---

[6] The "reaching limitation," (R. at 20), would appear to be related to Plaintiff's cervical disc disease/stenosis, (R. at 17).

substantial evidence, although this is not an ironclad
rule.

Rose, 34 F.3d at 18 (internal citations and quotation marks
omitted); see also SSR 96-6p, 1996 WL 374180, at *2-3.[7] The
"deciding factor," id., in Rose was "the nature of the illness,"
id., namely CFS.

Here, too, Plaintiff suffers from CFS, as well as
fibromyalgia. In Rose, the First Circuit stated that:

[T]he medical evidence establishes that claimant

_____

[7] SSR 96-6p provides in part that:

[T]he opinions of State agency medical and psychological
consultants and other program physicians and psychologists
can be given weight only insofar as they are supported by
evidence in the case record, considering such factors as the
supportability of the opinion in the evidence **including any
evidence received at the administrative law judge and Appeals
Council levels that was not before the State agency**, the
consistency of the opinion with the record as a whole,
including other medical opinions, and any explanation for the
opinion provided by the State agency medical or psychological
consultant or other program physician or psychologist. The
adjudicator must also consider all other factors that could
have a bearing on the weight to which an opinion is entitled,
including any specialization of the State agency medical or
psychological consultant.

In appropriate circumstances, opinions from State agency
medical and psychological consultants and other program
physicians and psychologists may be entitled to greater weight
than the opinions of treating or examining sources. For
example, the opinion of a State agency medical or
psychological consultant or other program physician or
psychologist may be entitled to greater weight than a treating
source's medical opinion if the State agency medical or
psychological consultant's opinion is based on a review of a
**complete case record** that includes a medical report from a
specialist in the individual's particular impairment which
provides more detailed and comprehensive information than what
was available to the individual's treating source.

SSR 96-6p, 1996 WL 374180, at *2-3 (S.S.A.)(bold added).

possesses a medical condition–CFS–that can reasonably be expected to produce the alleged fatigue. The question here is the extent to which claimant's fatigue in fact restricts his residual functional capacity. Such an inquiry–into the functional implications of a claimant's subjective symptoms–"is the kind of inquiry for which on-the-spot examination and observation of claimant might ordinarily be thought important. **The subjective severity of a claimant's fatigue associated with CFS is not something readily evaluated on an algid administrative record.**

34 F.3d at 19 (quoting <u>Berrios Lopez</u>, 951 F.2d at 432)(bold added)(internal citation omitted); <u>see also</u> <u>Johnson</u>, 597 F.3d at 413 (quoting <u>Rose</u>). The Court concludes that, given the "nature of the illness[es]," <u>Rose</u>, 34 F.3d at 18, and the fact that the DDS consultants did not have before them all of the medical evidence, <u>see</u> <u>Gordils</u>, 921 F.2d at 330 (noting that non-examining physician "did not have the complete medical record before him when he formed his opinion"), the ALJ should not have relied solely on the reports of the non-examining Disability Determination Services ("DDS") physicians in formulating Plaintiff's RFC. Alberto F. Tonelli, M.D., submitted his RFC assessment on June 6, 2005, (R. at 278), and Joseph F. Callaghan, M.D., affirmed Dr. Tonelli's assessment on November 28, 2005, (R. at 377)("I have reviewed all the evidence in [the] file and the assessment of 06/06/05 is affirmed as written."). They did not see, for example, a thorough report from Wendy Clough, M.D., who treated Plaintiff for nine years, (R. at

381).[8]  In that report Dr. Clough stated that:

> Overall, my experience with this patient was that she had
> an exceptionally severe and unresponsive case of chronic
> fatigue syndrome complicated by the presence of
> fibromyalgia.  She deteriorated steadily over the nine
> years that I followed her.  She did not respond to
> multiple standard interventions.  She not only consulted
> with me but also had other physicians who were unable to
> determine that alternative diagnoses were present to
> explain her condition so that no other treatment
> modalities could meaningfully be offered to her.  I
> believe that this patient was incapable of employment by
> the time that I left Rhode Island in the fall of 2003.
> I believe that any attempt on her part to work would have
> worsened an already very severe condition and greatly
> endangered her health.  I therefore left her with a
> strong recommendation to stay out of work.  I believe
> that given the long-term course of her illness, which has
> extended over more than a decade[,] and given the
> worsening of her illness, her prognosis is extremely
> poor.  I believe that she will continue to be
> indefinitely disabled and I do not see any time in the
> future when she could safely attempt to return to work.

(R. at 381)  In addition, the non-examining physicians did not see

a forty-four page report from Gary L'Europa, M.D., of NeuroHealth.

(R. at 384-427)  They did not see the last exhibit submitted by

Plaintiff's treating rheumatologist, Paul T. Marcaccio, M.D.  (R.

at 428-32); <u>see also</u> (R. at 428)(noting that Plaintiff still had

"persistent pain and fatigue," that her fibromyalgia and cervical

stenosis were "[p]ersistent and severe," that she "continue[d] to

do poorly," and that he supported her application for DIB "given

her chronic and severe pain and fatigue").  Thus, the "information

---

[8] The report bears a date of May 22, 2006.  (R. at 381)  It is
unclear whether it was written or received by S.S.A. on this date.  In
either case, however, it would have been impossible for Drs. Tonelli and
Callaghan to have seen it.

provided the expert[s]," <u>Rose</u>, 13 F.3d at 18, was incomplete, <u>Green</u> <u>v. Apfel</u>, No. C2-99-962, 2000 WL 1459428, at *6 (S.D. Ohio Sept. 21, 2000)(remanding for further consideration of plaintiff's mental status where ALJ relied on opinion of non-examining state agency psychologist "who did not have the benefit of reviewing all the psychological and psychiatric evidence ultimately reflected in the record"); <u>Rosario v. Apfel</u>, 85 F.Supp.2d 62, 66 (D. Mass. 2000) (concluding that because reviewing physicians did not consider full record, *inter alia*, ALJ's decision lacked substantial support).

In addition, Dr. Tonelli indicated that Plaintiff's "credibility is only partial," (R. at 273), apparently because on a function report she "check[ed] all functions as limited [except] for seeing and hearing," (<u>id.</u>); <u>see also</u> (R. at 110). He states that the medical evidence of record "does not appear to support such functional limitations ...." (R. at 273) However, he does not point to specific medical evidence which contradicts Plaintiff's alleged limitations, which the Court finds undermines the validity of his assessment. Thus, the Court concludes that the ALJ was not justified in relying on Dr. Tonelli's report, which Dr. Callaghan affirmed.

The Court finds that, in the circumstances of this case, the ALJ should not have relied exclusively on the reports of the non-examining consultants. Further, "because this comprises the only evidence in support [of the ALJ's RFC assessment], ... the ALJ's

finding is not supported by substantial evidence." <u>Rose</u>, 34 F.3d at 19; <u>see also</u> <u>Johnson</u>, 597 F.3d at 412 (noting that "although two non-examining physicians completed RFC assessments opining that claimant had the capacity for sedentary or light work, these assessments provide too cursory a basis upon which to rest a finding that claimant was not disabled").

Third, the ALJ discounted the evidence from Plaintiff's treating and examining sources. The ALJ stated that he "afford[ed] less probative weight to the opinions of the claimant's treating and/or examining sources (or other unacceptable medical sources[9]) who noted that she was 'totally disabled' and should 'stay out of work' since these opinions are conclusory without any specific physical limitations noted." (R. at 20-21)(internal citation omitted).

Regarding the medical evidence from these sources, the ALJ stated:

> Medical evidence of record discloses that as early as
> December 1994 Wendy Clough, MD reported that the claimant

---

[9] Here it appears the ALJ is referring to the vocational assessment performed by Paul R. Blatchford, Ed.M., on February 26, 2007. (R. at 127-41) The ALJ noted that:

> [T]his vocational assessment is not from a medical source: To the extent that it assumes medically based impairment of functioning not otherwise justified in the record, it is entitled to no evidentiary weight. It is afforded weight consistent with the degree to which the assumptions regarding functional capacity are justified in light of the rest of the record.

(R. at 20 n.4)(internal citation omitted).

had a "severe case" of worsening chronic fatigue syndrome
with the recommendation to "stay out of work" for a
period of "3 months" at that time.  During the period
from August 1996 to February 2007, the claimant consulted
numerous neurologists, orthopedists and other health
professionals for a multitude of "severe" pain and
fatigue complaints.  Diagnoses included chronic fatigue
syndrome, fibromyalgia, cervical radiculopathy, cervical
stenosis, degenerative disc disease, osteoarthritis,
migraine/post-traumatic headaches, myofascial pain
syndrome, carpal tunnel syndrome, ovarian cyst,
hypothyroidism and even depression/mood disorder, which
were all treated with a wide array of therapies including
medications, physical therapy, pain management, cortisone
block/botox/trigger point injections and even neck
surgery. ...  Although they did not state her specific
functional limitations, some of the claimant's treating
and/or examining physicians indicated that her "chronic"
pain symptoms, which significantly interfered with her
daily "functioning," rendered her "totally ("temporarily"
or "indefinitely") disabled" with the recommendation to
"stay out of work," since it was felt that her return to
work would exacerbate her symptoms during that time.

(R. at 19-20)(internal citations omitted).  The ALJ also noted

that:

    Consultative examining psychiatrist, Michael Vignogna,
    MD, recorded in May 2005 that the claimant had had denied
    significant depression or anxiety despite her long
    history of pain and fatigue complaints, though she did
    exhibit some memory problems and irritability/frustration
    on mental status examination.  Dr. Vignogna diagnosed a
    mood disorder manifest in a GAF of "60,"[10] consistent

_____

[10] The Global Assessment of Functioning ("GAF") "is a subjective
determination based on a scale of 100 to 1 of 'the clinician's judgment
of the individual's overall level of functioning.'" Langley v. Barnhart,
373 F.3d 1116, 1123 n.3 (10th Cir. 2004)(quoting Diagnostic and
Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-
IV-TR") at 32); see also Lopez v. Barnhart, 78 Fed. Appx. 675, 677 (10th
Cir. 2003)("The GAF scale is used by clinicians to report an individual's
overall level of functioning.").  The GAF "[c]onsider[s] psychological,
social, and occupational functioning on a hypothetical continuum of
mental health-illness." DSM-IV-TR at 34.  A GAF between 51-60 is
indicative of "**[m]oderate symptoms** (e.g., flat affect and circumstantial
speech, occasional panic attacks) **OR moderate difficulty in social,**

with not more than moderate symptoms or functional
impairment.

(R. at 20)(internal citations omitted).   Dr. Clough and Dr.
Vignogna are the only two treating or examining sources mentioned
by name, and their reports are the only ones specifically
discussed.[11]

Consistent with 20 C.F.R. § 404.1527(e), the ALJ was not
required to accept opinions, even from treating sources, that
Plaintiff was "disabled" or "unable to work."   20 C.F.R. §
404.1527(e) (2011).[12]   However, such opinions "must never be

_____

**occupational, or school functioning** (e.g., few friends, conflicts with
peers or co-workers).

[11] The ALJ did not specifically refer to Dr. Clough's 2006 report.
(R. at 381)

[12] Section 1527(e) provides in relevant part that:

Opinions on some issues, such as the examples that follow, are
not medical opinions ... but are, instead, opinions on issues
reserved to the Commissioner because they are administrative
findings that are dispositive of a case; i.e., that would
direct the determination or decision of disability.

(1) Opinions that you are disabled.  We are responsible
for making the determination or decision about whether
you meet the statutory definition of disability.  In so
doing, we review all of the medical findings and other
evidence that support a medical source's statement that
you are disabled.  A statement by a medical source that
you are "disabled" or "unable to work" does not mean
that we will determine that you are disabled.

....

(3) We will not give any special significance to the
source of an opinion on issues reserved to the
Commissioner described in paragraphs (e)(1) and (e)(2)
of this section.

ignored," SSR 96-5p, 1996 WL 374183, at *1 (S.S.A.), and the ALJ's decision must explain the consideration given to treating source opinions, id. Moreover, "[i]n evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR [§] 404.1527(d) ...."[13] Id. at *3.

Here, the only reason given by the ALJ for affording less probative weight to Plaintiff's treating and/or examining sources than to the non-examining consultants is they were "conclusory

---

20 C.F.R. § 404.1527(e) (2011).

[13] Section 404.1527(d) provides in relevant part that:

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(d)(2) (2011). In evaluating medical opinions, an ALJ is directed to consider the existence of an examining relationship, the existence of a treating relationship, the length, nature, and extent thereof, the supportability of an opinion, the consistency of an opinion with the record as a whole, the specialization of the source, and any other factors which the claimant brings to the adjudicator's attention. See 20 C.F.R. § 404.1527(d)(2)-(6).

without any specific physical limitations noted." (R. at 20-21)
While, again, the ALJ was not obligated to adopt opinions that
Plaintiff was disabled, and on the surface his point regarding the
lack of physical limitations is persuasive, it is clear that the
ALJ failed to evaluate these opinions according to the requirements
of section 1527(d). It does not appear that the ALJ considered
every factor listed in § 404.1527(d)(2)-(6) with regard to each of
the "numerous neurologists, orthopedists and other health
professionals," (R. at 19), from whom Plaintiff sought treatment,
none of whom, except Dr. Clough, (R. at 19), were referenced by
name.

Moreover, given the nature of Plaintiff's illnesses,
particularly the combination of CFS and fibromyalgia, the
longitudinal medical records of Plaintiff's medical sources,
"especially treating sources," SSR 99-2p, 1999 WL 271569, at *6;
see also Rose, 34 F.3d at 19, are "extremely helpful," SSR 99-2p,
1999 WL 271569, at *6, in documenting, among other things,
Plaintiff's functional status over time, id. SSR 99-2p states
that:

> In evaluating credibility, the adjudicator should ask the
> treating or other medical source(s) to provide
> information about the extent and duration of an
> individual's impairment(s), including observations and
> opinions about how well the individual is able to
> function, the effects of any treatment, including side
> effects, and how long the impairment(s) is expected to
> limit the individual's ability to function.

SSR 99-2p, 1999 WL 271569, at *7; see also id. ("Opinions from an

individual's medical sources, especially treating sources, concerning the effects of CFS on the individual's ability to function in a sustained manner in performing work activities or in performing activities of daily living are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC."). Thus, if the ALJ found the statements of all of Plaintiff's treating and examining sources inadequate because they were "conclusory without any specific physical limitations noted," (R. at 20-21), he should have asked for more specific function reports.[14]  See Landry v. Astrue, Civil Action No. 06-30220-KPN, 2007 WL 4378161, at *5 (D. Mass. Dec. 7, 2007)("As the Tenth Circuit has explained, 'it is not the rejection of the treating physician's opinion that triggers the duty to recontact the physician; rather it is the inadequacy of the

---

[14] The First Circuit has stated that:

> [S]peaking hypothetically, if the only medical findings in the record suggested that a claimant exhibited little in the way of physical impairments, but nowhere in the record did any physician state in functional terms that the claimant had the exertional capacity to meet the requirements of sedentary work, the ALJ would be permitted to reach that functional conclusion himself.

Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990); see also id. (noting that Commissioner is not precluded from rendering common-sense judgment regarding functional capacity based on medical findings as long as he does not overstep the bounds of a layperson's competence and render a medical judgment). Here, however, the medical record suggests more than "little in the way of physical impairments," id., and the complexity of Plaintiff's illnesses, specifically CFS and fibromyalgia, and functional limitations resulting therefrom, would appear to this Court to be beyond a layperson's competence, see id.

evidence the ALJ received from the claimant's treating physician that triggers the duty.'")(quoting <u>White v. Barnhart</u>, 287 F.3d 903, 908 (10th Cir. 2001)); <u>see also</u> 20 C.F.R. § 494.1512(e)(1) (2011).

Fourth, the ALJ found that Plaintiff's "mental impairments (including headaches) would only cause a 'moderate' restriction in her ability to maintain attention/concentration." (R. at 21) While the ALJ's finding regarding Plaintiff's depression would appear to be supported by substantial evidence,[15] the Court is troubled by the fact that the ALJ included her migraine headaches, which should have been considered separately, among her "mental

---

[15] The ALJ correctly observed that:

> Concerning her depression, the claimant has sought out very little psychiatric and/or psychological treatment with no mental functional assessment contained in the record aside from a consultative psychiatric examination administered in May 2005 which shows that her mood disorder causes a GAF of "60" which is consistent with only moderate symptoms. Indeed, the State agency consultants, both at the initial and reconsideration determination levels, noted that the claimant's depressive disorder would only cause a "moderate" limitation in her concentration/persistence/pace.

(R. at 21)(internal citations omitted). Thus, with regard to Plaintiff's depression, the State agency consultants' assessments were consistent with the only other psychiatric report in the record. (R. at 248-66, 268-70, 378) At the initial level, Susan Diaz-Killenberg, M.D., found Plaintiff's allegations to be credible and stated that the diagnosis of record was "depression secondary to medical condition (fibromyalgia and chronic fatigue)." (R. at 264) On reconsideration, J. Stephen Clifford, Ph.D., affirmed Dr. Diaz-Killenberg's assessment as written. (R. at 378) It was noted on the Rhode Island DDS Case Review Form that the only additional update to the psychiatric/psychological record on reconsideration was from a Licensed Clinical Social Worker, (<u>id.</u>), who saw Plaintiff twice and recommended that Plaintiff undergo a "psych. med. eval.," (R. at 360). There is no evidence in the record that such evaluation was ever performed. Plaintiff reported that she suffers from "secondary depression," (R. at 118), due to her illness but not "primary depression," (<u>id.</u>).

impairments," (id.). Moreover, the medical evidence of record indicates that Plaintiff's headaches affect her more than "moderate[ly]," (id.).

For example, Plaintiff has been treated with a number of medications, which have been largely ineffective, as noted by her treating neurologists, Elaine C. Jones, M.D., and Dr. L'Europa of NeuroHealth. Dr. Jones indicated on February 14, 2005, that Plaintiff's headaches and cervical strain "cont[inue] to be resistant to meds," (R. at 347), and on March 14, 2005, that "[n]othing seems to help," (R. at 348). Also on March 14th, Dr. Jones reported to DDS that "[w]e have tried a variety of meds with limited response." (R. at 350) Dr. L'Europa recorded on November 22, 2005, that Plaintiff had been treated with "multiple medications, including anti-inflammatory medications and muscle relaxants, ... which were ineffective." (R. at 384)

Plaintiff underwent a cervical diskectomy with fusion at C5-6 on June 9, 2005. (R. at 281-82, 354, 358, 368-71) Although the surgery brought improvement in her right upper extremity, it did not relieve her posterior cervical pain or headaches. (R. at 288, 354, 368-71, 385) Prakash Sampath, M.D., who performed the operation, noted on several occasions that Plaintiff continued to have problems thereafter. (R. at 368)(noting that Plaintiff was having "a great deal of muscle spasms in her left side"); (R. at 369)("[Plaintiff] continues to have a great deal of problems. She

still has a lot of pain in her neck as well as going down into her shoulders. ... Her biggest concern also is severe spasms in the trapezius muscles along with headaches."); (R. at 370)("[Plaintiff] continues to have a great deal of problems. She has migraine headaches, posterior neck spasms as well as neck pain."); (R. at 371)(noting that Plaintiff "continues to complain of fairly severe neck pain and spasms").

In addition, Plaintiff has received physical, chiropractic, and massage therapy, a left cervical facet injection, a left cervical cortisone injection, and a left cervical medial branch block. (R. at 386) She was subsequently administered "trigger point injections of bilateral lower cervical paraspinal muscles ... with moderate effect," (R. at 390), and "left occipital [muscle], mildly effective," (R. at 418), as well as Botox injections, (R. at 398, 411, 425, 427). Plaintiff also saw a pain management specialist, Hafeez Khan, M.D., who, in a letter to the S.S.A. dated February 13, 2006, opined that "her complaints as to the level and description of her pain are sincere. She does not appear to be a malingerer." (R. at 379) This level of treatment does not suggest that Plaintiff's headaches would have only a "moderate" effect on her level of functioning.

Fifth, the ALJ stated that:

The claimant is affected primarily by conditions and syndromes which are marked by their subjectivity. She worked for many years prior to her date of alleged onset of disability despite many of these symptoms. Few of her

> described limitations in daily activities can be linked
> to conditions which can be demonstrated by any objective
> medical test, and when she needs to engage in an activity
> (drive to a doctor's appointment, e.g.) she is generally
> able to do what is needed. It is revealing that she was
> able to travel to Mexico on vacation. Furthermore, there
> is no indication in the medical record that the
> claimant's medications have caused any significant
> ongoing side-effects.

(R. at 21)(footnotes omitted). The ALJ is correct that Plaintiff's

conditions, primarily CFS and fibromyalgia, "are marked by their

subjectivity." (Id.) That is the nature of CFS and fibromyalgia.

See Rose, 34 F.3d at 18 ("lack of objective proof is what one may

expect in cases of CFS"); Johnson, 597 F.3d at 412 (noting that "a

patient's report of complaints, or history, is an essential

diagnostic tool" in fibromyalgia cases)(quoting Green-Younger, 335

F.3d at 107). The fact that the nature of Plaintiff's illnesses is

marked by subjectivity is not a basis to discount her testimony.

Moreover, Plaintiff's reports of symptoms to her treating sources

are consistent over time. See Rose, 34 F.3d at 18 (noting that

medical references in record to symptoms of CFS were "strikingly

consistent").

Further, the ALJ's statements, quoted above, are either

incomplete or overstated. For example, the ALJ states that

Plaintiff "worked for many years prior to her date of alleged onset

of disability despite many of these symptoms." (R. at 21)

Although he noted that Dr. Clough advised Plaintiff in December of

1994 to stay out of work for three months, (R. at 19, 465), he

omitted Plaintiff's subsequent work history. When Dr. Clough followed up with Plaintiff in the spring of 1995, Plaintiff was working twenty-four hours per week, which was subsequently reduced to sixteen hours per week and then to twelve hours per week. (R. at 381) After a brief period of improvement, during which Plaintiff worked eighteen hours on a weekly basis, Plaintiff became pregnant and "attempted to work eight-hour workweeks during that time." (Id.) After her pregnancy, according to Dr. Clough, Plaintiff continued to do very poorly, and Dr. Clough advised her to stay out or work "since any effort to work or increase her activity level would only worsen her symptomatology." (Id.) Moreover, this work activity preceded Plaintiff's alleged onset of disability. See Lingenfelter v. Astrue, 504 F.3d 1028, 1039 (9th Cir. 2007)("[The plaintiff's] failed work attempt did not even take place during the relevant time period."). In addition, although the ALJ stated that Plaintiff could drive to a doctor's appointment, (R. at 21), Plaintiff testified that she did not drive often, (R. at 522), and her husband testified that she only drove to doctor's appointments which were close, (R. at 535). With regard to the Mexico vacation, Plaintiff testified that even with a stop-over, "[t]he plane ride was torturous," (R. at 526), and that, once there, "the heat was just too much for [her]," (id.); cf. Cohen v. Sec'y of Health & Human Servs., 964 F.2d 524, 531 (6th Cir. 1992)("[The plaintiff's] efforts to continue dancing merely

suggest that she was struggling to maintain some semblance of normalcy in a life otherwise turned on end by the onset of chronic fatigue syndrome."). Finally, as to side effects of medications, the medical evidence reveals that, at least on two occasions, Plaintiff was unable to tolerate her medication due to side effects. (R. at 354)(including, in Dr. Jones' notes, that Plaintiff could not tolerate 3 Topamax per day); (R. at 428) (reflecting Dr. Marcaccio's report that "[s]he did not tolerate the Clinoril, it gave her [gastrointestinal] upset").

The Court has found that the ALJ relied on the lack of objective findings in discounting Plaintiff's subjective complaints. He also relied on the opinions of DDS physicians who based their opinions on an incomplete medical record and rejected the opinions of Plaintiff's treating sources as cursory and lacking functional limitations. The only source who evaluated Plaintiff at the request of DDS was a psychiatrist. No medical expert testified at the hearing. In the circumstances of this case, the ALJ's RFC finding cannot be said to be supported by substantial evidence in the record. Accordingly, the matter should be remanded for further evaluation of Plaintiff's RFC.

## II. The ALJ's credibility finding

The Court's conclusion that the ALJ's RFC determination is not supported by substantial evidence necessarily implicates his credibility finding. Although such credibility finding is

generally entitled to deference, see <u>Frustaglia v. Sec'y of Health</u> <u>& Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987)("The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings.")(citing <u>DaRosa v. Sec'y of Health & Human</u> <u>Servs.</u>, 803 F.2d 24, 26 (1st Cir. 1986)), here the ALJ's credibility finding was based on the inconsistency of Plaintiff's subjective complaints with the unspecified "medical evidence of record," (R. at 19), and with the opinions of the DDS non-examining physicians, (R. 20, 21). The Court has found that the ALJ's evaluation of the medical evidence was flawed and that his reliance on the opinion of the DDS consultants was unjustified. Therefore, on remand Plaintiff's credibility should be reassessed.[16]

## III. The ALJ's Step 5 finding

Similarly, because the ALJ's RFC finding is not supported by substantial evidence in the record, the ALJ's finding that Plaintiff retained the RFC to perform jobs which existed in substantial numbers in the national economy is, by extension, unsupported by substantial evidence. See <u>Lingenfelter</u>, 504 F.3d at

---

[16] The Court recognizes that the ALJ utilized the proper procedure for evaluating Plaintiff's credibility. See <u>Avery v. Sec'y of Health & Human Servs.</u>, 797 F.2d 19 (1st Cir. 1986); 20 C.F.R. § 404.1529 (2011); SSR 96-7p, 1996 WL 374186, at *3 (S.S.A.). However, since his credibility finding is intertwined with his RFC finding, both should be reconsidered on remand.

1041 ("Nor does substantial evidence support the ALJ's step-five determination, since it was based on this erroneous RFC assessment."). Moreover, the ALJ does not appear to have included limitations stemming from all of Plaintiff's impairments in his RFC assessment. (R. at 540-42) For example, although the ALJ asked the VE if someone who had to wear "wrist immobilizing splints," (R. at 542), such as those worn for carpal tunnel syndrome, could perform the jobs the VE had listed, (id.), the ALJ included no restrictions in his RFC assessment based on Plaintiff's bilateral carpal tunnel syndrome, despite her history of surgery and physical therapy, (R. at 516), diagnostic testing which revealed bilateral carpal tunnel syndrome, (R. at 409), and testimony that she experienced "[n]umbness and tingling in [her] left hand and [her] right hand is very weak," (R. at 524). The only restrictions in the ALJ's RFC assessment are a need to avoid "prolonged significant standing/walking," (R. at 22), which was not part of any of the ALJ's hypothetical inquiries to the VE,[17] (R. at 540-42), and work hazards such as unprotected heights or dangerous machinery as well

_____

[17] The ALJ's hypothetical question to the VE restricted the claimant to work at the sedentary level limited by the inability to perform complex or detailed tasks and to performing simple work tasks over an eight-hour day, assuming normal breaks every two hours. (R. at 540) He further limited the hypothetical claimant to work in environments in which dust, smoke, gasses, chemical agents, and other irritants were held to levels comparable to those found in public office buildings, (id.), presumably related to Plaintiff's asthma (which was not found to be a severe impairment), (R. at 17 n.2).

as a "moderate" limitation in maintaining attention/concentration,[18] (R. at 22). Although he found Plaintiff's carpal tunnel syndrome to be non-severe, the ALJ was, nonetheless, required to consider it in formulating Plaintiff's RFC. See 20 C.F.R. § 404.1545(a)(2) (2011) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' ... when we assess your residual functional capacity."). In any event, after reconsideration of Plaintiff's RFC, it will have to be redetermined whether Plaintiff is capable of performing work existing in significant numbers in the national or regional economy.[19]

---

[18] The "moderate" limitation in Plaintiff's ability to maintain attention/concentration was attributed to her mental impairments. (R. at 21)

[19] Plaintiff's argument that the current economy, technological advances, and outsourcing of jobs to foreign countries, see Plaintiff's Mem. at 13, should be considered is rejected. Regarding inability to obtain work, 20 C.F.R. § 404.1566 provides in relevant part that:

> We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of--
>
> (1) Your inability to get work;
>
> (2) Lack of work in your local area;
>
> (3) The hiring practices of employers;
>
> (4) Technological changes in the industry in which you have worked;
>
> (5) **Cyclical economic conditions**;
>
> (6) No job openings for you;

## IV. Plaintiff's other claims of error

The Court has found that the matter should be remanded for further evaluation of Plaintiff's RFC and credibility, which may ultimately affect the ALJ's Step 5 determination. Therefore, the Court need not address Plaintiff's additional claims of error.

### Summary

The Court finds that the ALJ's RFC determination is not supported by substantial evidence in the record. Accordingly, I recommend that the matter be remanded for further evaluation of Plaintiff's RFC. I further recommend that on remand Plaintiff's credibility be reassessed as well. Because these issues affect the ALJ's step five determination that Plaintiff was able to perform jobs existing in significant numbers in the national economy, that finding should also be addressed in light of the reconsideration of Plaintiff's RFC.

### Conclusion

The Court finds that the ALJ's determination that Plaintiff is not disabled within the meaning of the Act is unsupported by substantial evidence in the record. Accordingly, I recommend that Plaintiff's Motion to Remand be granted to the extent that the

---

(7) You would not actually be hired to do work you could otherwise do; or

(8) You do not wish to do a particular type of work.

20 C.F.R. § 404.1566(c) (2011) (bold added).

matter be remanded for further administrative proceedings. I also recommend that Defendant's Motion to Affirm be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
March 27, 2012